(No. 27165.—)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM NIKSIC, Plaintiff in Error.

*Opinion filed January 18, 1944—Rehearing denied March 16, 1944.*

Wm. Scott Stewart, of Chicago, for plaintiff in error, on review, only.

George F. Barrett, Attorney General, and Thomas J. Courtney, State's Attorney, of Chicago, (Edward E. Wilson, John T. Gallagher, and Melvin S. Rembe, all of Chicago, of counsel,) for the People.

Mr. Justice Thompson delivered the opinion of the court:

Plaintiff in error, William Niksic, hereinafter called the defendant, seeks to reverse a judgment and sentence of the criminal court of Cook county, on a verdict of guilty, on an indictment for the entering of the home of the prosecuting witness with intent to commit the crime of rape. The sentence was for imprisonment in the penitentiary from one year to life. No question as to the sufficiency of the competent evidence to prove defendant guilty beyond a reasonable doubt is raised. The only alleged errors argued relate to the admission and rejection of evidence as to defendant's reputation, and to the rejected offer of proof to lay a foundation for impeaching testimony to show that the prosecuting witness had previously made statements inconsistent with her testimony at the trial.

The facts disclosed by the record are that on the night of January 27, 1942, defendant had gone to a tavern on

Sixty-third street in Chicago, where he encountered a young lady. They visited another tavern across the street and were drinking. They remained there until closing time, when he went to take the lady home. At her direction he drove her in his car to One-hundred-third street and Maplewood avenue. They remained the rest of the night in the car as the defendant testified, "talking and necking," until about seven o'clock in the morning when the girl got out and walked home as he could not start his car. The car was parked on the east side of Maplewood avenue facing north. While he was outside the car trying to fix it he saw, through the kitchen window, the prosecutrix and her husband caressing each other and then saw the husband leave the house about 7:10 A. M. on the morning of January 28, and saw the prosecutrix wave through the window. Defendant claims that he thought she was waving at him and he waved back. Her testimony was that she was waving good-bye to her husband, that she never saw the car of defendant, and there is no evidence that she ever saw defendant wave to her. He had been drinking heavily.

He got his car started, drove around the block and saw the husband "all the way up the street." He came around the block, stopped his car in front of the home of the prosecutrix and went up to the house. The prosecutrix, hearing the doorbell ring, went to the front door and opened it, leaving the storm door closed. Defendant testified he said to her, "Your husband went to work." She testified that she had just talked over the phone to her mother when she heard the doorbell ring; that she went to the door and saw defendant whom she did not then know, standing at the door with his car parked out in front; that she could not hear what he said so she opened the the door to hear his words; that he said, "Your husband has been hurt, has been struck by the street car at 103rd

and Western Avenue and has been taken to the hospital;" that she said, "Oh, my God, everything is happening to me today," and that he said he would take her to the hospital; that she had on a long woolen robe over her nightgown, so she turned and rushed to the bedroom to get a sweater and, not knowing that he had entered the house, was leaning over the dresser drawer to grab a sweater, when he grabbed her, pinned her arms down, pulled her over on the bed and raped her in spite of her struggles; that in her attempt to prevent the assault he struck her near the eye and scratched her wrists until they were bleeding.

Defendant's version of the affair was somewhat but not materially different in essential details. He testified that when the prosecutrix opened the door she said, "Is my husband hurt?"; that when she opened the door he stepped inside; that she had on a robe over a nightgown and started to go to her room, telling him that her grandmother died that day; that she went to the bedroom and stood around and went to the other side of the room; that he said to her, "You know it is just a lot of tomfoolery about your husband being hurt;" that he got his arms around her, tried to kiss her and she said, "Don't do that!"; that he grabbed her and proceeded to have intercourse with her, disregarding her protests and her pleading for him not to do it because she was pregnant. When asked what his intentions were, when he entered the house, he said she waved and he "could not think of anything except enhance his social position."

On cross-examination defendant admitted that he had testified at a previous trial that he had told the prosecutrix that her husband was hurt and that he had made a like statement in the State's Attorney's office. He admitted following her into the bedroom, that he told her she was pretty, put his arms around her and laid her on the bed; that the bed was maybe two feet from where she was un-

dressing; that he tried to kiss her and that he pushed her down on the bed in order to have intercourse with her. He admitted facts which were conclusively convincing to any jury that he held her and perpetrated the crime charged. No jury could have any reasonable doubt that he entered the house with the intent to commit the crime charged. The evidence reveals the defendant saw the husband leave the house; that he then drove around the block and saw the husband all the way up the street; that he drove in front of the house, parked his car, surprised the prosecutrix just as the news came of her grandmother's death, took advantage of her fright after telling her that her husband was hurt, or at least using words that induced her to believe he was injured.

It was, of course, necessary in the instant case to prove defendant entered the home of the prosecutrix with the intent to commit rape. This was an essential element of the crime of burglary as charged in the indictment. Such intent, however, may be inferred from the acts and words of the defendant. (*People* v. *McKinnie,* 328 Ill. 631.) And it was the province of the jury to consider all the facts and circumstances surrounding the case as shown by the evidence to determine the intent with which the crime was committed. Intent, in a burglary case, may be inferred from the proven facts and circumstances. (*People* v. *Geisler,* 348 Ill. 510.) From these facts and circumstances intent was clearly proved.

Defendant urges the court erred in sustaining objections to questions asked the prosecutrix, relative to an alleged conversation with defendant's sister. As the proper foundation for impeachment was not laid, there was no error by the court in sustaining objections in this regard. *People* v. *Perri,* 381 Ill. 244.

It is contended the court erred in permitting the prosecuting attorney to get before the jury, evidence of defendant's conduct toward a young-lady witness on another occa-

sion and also testimony of another lady called as a character witness as to a report of an attack, made to her by another girl, as well as his conduct toward the witness. Three girls were called by the prosecution to rebut the testimony of defense witnesses as to defendant's reputation. They all testified his reputation for chastity was bad. One of the witnesses testified that she met defendant on January 20, 1942. On cross-examination counsel for defendant brought out that she was with Florence Valiquet on the morning of January 20, 1942, on their way home from Flint, Michigan; that they were trying to fix a tire about 4:30 A. M. when she first met defendant. Counsel for defendant then asked her, "Did he do anything immoral to you?" The court sustained an objection to that question. Counsel then asked her, "Did you ever see him do anything immoral?" The court permitted her to answer over objection and she answered, "No." The prosecuting attorney then asked her, on redirect examination, "Did you at that time hear of him doing something immoral to Florence Valiquet?" To this question defendant's counsel objected and the objection was overruled on the ground that defendant's attorney had opened the door. She answered, "Yes." After she had answered another question by detailing how defendant had taken her and her sister to an oil station to get someone to come and fix the down tire, and finding the station closed at that hour, had left them on the pretense that he was going back to fix the tire himself, she then testified that Florence Valiquet said that defendant picked her up. The court overruled objections to this line of interrogation on the ground that defendant's counsel had opened the door, and that reputation depends upon what others say. On recross-examination counsel for defendant asked the witness if defendant said or did anything immoral to her or her sister and the answer was, "No sir, but he suggested." She said he suggested that one of them ride downtown.

Florence Valiquet was recalled by the prosecution and was asked what happened after she got in the car with him. The court permitted her, over objection, to testify that he told her he was going to take her to the gas station so she could pay for a jack but instead rode her around for a long time and attacked her; that she did not know where she was and could not find her partners; that she fought with him for fifteen or twenty minutes; that he threatened to hit her, knocked her on top of the head, and finally she jumped out of the car and ran down the road; that he turned the lights on and off so she could not see the license number and then he went the other way. Counsel for defendant moved that the testimony be stricken. The court overruled the motion.

The general rule that reputation cannot be impeached by proof of particular acts has certain exceptions as equally well settled as the rule itself. Under the exceptions, acts, in themselves distinct substantive crimes, may be proved to show, among other purposes, intent or guilty knowledge. (*People* v. *Rogers,* 324 Ill. 224.) The question of intent at the time defendant entered the house of the prosecutrix is the only element of the crime defendant's counsel even intimates was not established. If the proof of his previous unchaste conduct was not admissible, his counsel brought out the inquiry. The prosecuting attorney objected and the court at first properly sustained the objection. Counsel insisted on pressing the inquiry into his conduct towards the lady witnesses and then the court permitted him to elicit the answer. Clearly, he cannot complain of, and ask that his case be reversed for, error of which he is guilty himself. *Lipsey* v. *People,* 227 Ill. 364.

The proof of good reputation in this record has been duly considered. It is not, however, proof of innocence but it may be relied on as sufficient to raise a reasonable doubt when the other evidence is not of a satisfying character. (*People* v. *Koloski,* 309 Ill. 468.) Here the evi-

486

dence clearly shows defendant guilty as charged in the indictment.

Where the competent evidence so thoroughly proves the defendant's guilt beyond a reasonable doubt, as it does in this case, so that the jury could not conscientiously have arrived at any other verdict, the judgment of conviction will not be disturbed for errors which, in a close case, would require a reversal. (*People* v. *Reeves,* 360 Ill. 55; *Jennings* v. *People,* 189 Ill. 320.) The conviction must be affirmed.

The sentence of the court is erroneous, (*People* v. *Montana,* 380 Ill. 596,) and for that reason the judgment is reversed and the cause remanded, with directions to enter a proper sentence.

*Reversed and remanded, with directions.*