13 A.3d 83

Robert FRAZIER

v.

STATE of Maryland.

No. 1472, Sept. Term, 2009.

Court of Special Appeals of Maryland.

Feb. 3, 2011.

Allison P. Brasseaux (Paul B. DeWolfe, Public Defender, on the brief), Baltimore, MD, for appellant.

Sharon S. Street (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for appellee.

Panel: *HOLLANDER, WRIGHT and IRMA S. RAKER (Retired, Specially Assigned), JJ.

WRIGHT, J.

Appellant, Robert Frazier, was indicted in the Circuit Court for Baltimore City, and charged with distribution of cocaine, possession with intent to distribute cocaine, and possession of cocaine. Following a jury trial, Frazier was convicted on all counts. He was subsequently sentenced to fifteen years for distribution of cocaine. Frazier timely appealed and presents the following questions for our review:

1. Did the trial court's *voir dire* method deprive Mr. Frazier of his constitutional right to a fair and impartial jury?

2. Did the trial court abuse its discretion when it denied Mr. Frazier's motion for a mistrial?

3. Did the trial court err when it overruled defense counsel's objection to the prosecutor's closing argument?

For the following reasons, we shall affirm.

## BACKGROUND

*Jury Selection*

Prior to beginning the *voir dire* procedure, the trial judge informed the jury as follows:

I'm going to ask you a series of questions. At the end of each group of questions, those of you who are answering will come to the bench and give your answers in the relative

---

* Hollander, Ellen L., participated in the hearing and conference of this case while an active member of this Court, but she resigned from the Court of Special Appeals prior to the filing of the actual opinion.

privacy that we can afford you. Counsel will use these questions and answers in order to decide which jurors to challenge and which jurors to keep. And that's how we get the panel down from 58 to 12 with an alternate.

If you're not sure whether information you possess is an answer to a question, please err on the side of answering. It's better for us to know too much rather than too little. We don't want to have a situation where we try the case, send the jury out to deliberate, and somebody goes to the jury room and says, "I can't do it," "I can't return a unanimous verdict," "I've got this problem." The time to tell us about the problem is now, not later.

The court then began the *voir dire* procedure by asking a group of questions concerning whether the jurors knew Frazier, the attorneys, the judge or his staff, or any witnesses in the case. The court also asked if the venire knew anything about the case, whether they were racially biased against Frazier, or if any member of the venire belonged to a religion that prevented them from judging another person. At the conclusion of this first group of questions, the court then stated, "if anybody is answering any of those questions, please form a line." The court then heard from eighteen (18) prospective jurors at the bench.

Thereafter, the court asked the second series of *voir dire* questions, indicating that "the next question has three parts." The court asked if any prospective juror had ever served as a juror or grand juror, whether they could never vote not guilty or guilty, or whether any juror, their family or friends, had any experience whatsoever with street drugs, including treatment or simply having witnessed drug transactions in their neighborhood. The court then directed those answering to approach the bench, and thirty-one (31) prospective jurors responded. Of those thirty-one prospective jurors, one juror asked the court to repeat the question.

The court then asked a third group of questions, stating "question number three many of you have answered already. Please don't answer it again. Only come if there is new

information." The court then asked if any member of the panel would automatically believe or disbelieve testimony of a law enforcement officer, a State's witness, or a defense witness. The court also asked if anyone, or their friends or family, were employed or closely associated with law enforcement. Those answering affirmatively were directed to form a line, and fourteen prospective jurors responded.

Finally, the court asked a fourth group of questions, informing the venire that "the last question has several components." The jury was asked if they, their family, or their friends had "any kind of contact with the criminal justice system or the court system," including being a victim or a witness, or having been arrested or incarcerated. The court also stated that if any prospective juror did not understand the questions, did not speak English, were not over eighteen years of age, or were not a United States citizen, then those prospective jurors should "join the line." The court informed the venire about the burden of proof in a criminal case, and asked if any person would hold the State to a different burden or would "hold the Defendant to any burden at all," or whether they would be unable to follow the court's instructions. Finally, the court stated that if any prospective juror had anything else they wanted to inform the court, including any scheduling issues, "please bring it to our attention."

After asking the prosecutor and defense counsel if he missed "any important questions," and after both attorneys responded in the negative, the court then heard individually from eighteen members of the venire. After this, the court entertained challenges for cause from the attorneys and excused thirty-one of the prospective jurors. The attorneys then proceeded to select a jury and both parties used all of their peremptory strikes.

*Trial*

Trial commenced and the State's first witness was Lieutenant Ian Dombronsky, employed with the Baltimore City Police Department for approximately twelve years. Lieutenant Dombronsky testified that he had been involved in various

divisions within the department over the years, including working in an undercover capacity to buy drugs on the streets of Baltimore City. At the time of the events at issue in this case, Lieutenant Dombronsky was assigned as a supervisor in the Violent Crime Impact Division. He also testified he had over 150 hours of specialized training in the enforcement of narcotics laws.

On December 18, 2008, at approximately 9:10 p.m., Lieutenant Dombronsky was in plain clothes, driving an unmarked police vehicle, in the area of Presbury Street and Moreland Avenue, because that area had the "highest volume of CDS calls for service" at that time. As he was driving around the area, Lieutenant Dombronsky saw Frazier and Frazier yelled "Yo" several times towards the officer. Believing that Frazier was flagging him down in order to sell drugs, Dombronsky stopped his vehicle, rolled down the passenger side window, and asked Frazier, "Who's got some ready out?" "Ready," Dombronsky explained, was a street term for crack cocaine. Frazier asked: "How many?" After Dombronksy replied that he wanted three, Frazier told Dombronksy to park in the 2400 block of Presbury Street.

At this point, Lieutenant Dombronsky did not have an arrest team set up, so he decided to make the purchase using his own personal money. While Frazier was walking to a parked minivan, on the other side of Moreland Avenue, Dombronsky pulled out a twenty dollar bill and two five dollar bills and began making small tears in those bills for purposes of later identification.

While he was making those tears, Frazier returned and asked, "Why are you tearing the money?" and "You ain't no police, are you?" Lieutenant Dombronsky handed over the money and, as Frazier handed over three bags of suspected crack cocaine in return, Dombronsky tried to change the subject by stating, "This isn't no burn, is it?" meaning that he was asking if the drugs were fake. Frazier replied no, and then quickly left the scene. Lieutenant Dombronsky then made the tactical decision not to pursue Frazier at that time.

Lieutenant Dombronsky drove away and parked his vehicle away from the area where the transaction occurred. He then got out of his vehicle on foot and walked to a vacant house that he sometimes used for purposes of surveillance. A short time later, Frazier returned to the area, having moved the aforementioned minivan closer to Lieutenant Dombronsky's vantage point.[1]

At that time, Dombronsky observed Frazier engage in another suspected drug transaction with an occupant of a silver sports utility vehicle. Dombronsky called for an arrest team and provided a radio description of the minivan Frazier was operating. That team was unable to find Frazier or the minivan, and Lieutenant Dombronsky returned to the police station in order to obtain a marked police vehicle.

After Dombronsky returned to the area in the marked unit, he found Frazier on Thomas Avenue near the minivan. Lieutenant Dombronsky recognized Frazier, as well as the jacket he was wearing, from the earlier drug transaction that evening. Dombronsky got out of his vehicle and spoke to Frazier, and Frazier was placed under arrest after other police officers from the Western District arrived on the scene.[2]

Once the arrest team arrived, Frazier was placed in handcuffs and read his rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Lieutenant Dombronsky testified that he believed that Frazier understood his rights by nodding his head, and Frazier began stating "things along the lines of 'I'll get you guys a gun if you let me go,' or 'I'll tell you about drug dealers,' and things of that

---

1. At some point, Lieutenant Dombronsky ran the tags of the minivan and learned that the vehicle was registered to Frazier.

2. During the course of Lieutenant Dombronsky's testimony, he referred to an aerial photograph of the scene. Near the end of that portion of the testimony, defense counsel made a motion for mistrial concerning interactions between the sheriff and Frazier. As that motion is the subject of Frazier's second question presented, we will discuss this motion in more detail in the following discussion section.

nature." Lieutenant Dombronsky maintained that he had not begun to question Frazier when those statements were made.

Instead, Lieutenant Dombronsky searched Frazier's person and did not recover the money that he gave Frazier earlier during their transaction. The twenty dollar bill that Dombronsky tore was recovered from the center console of the minivan. Dombronsky also verified that this was the same twenty dollar bill because it was in sequential order by serial number with a number of other bills he obtained earlier from an ATM machine. Police also recovered $254 in currency from the minivan.

Frazier was transported to the Western District where he was interviewed in the presence of Lieutenant Dombronsky, Detective Ethan Globther, and Detective Ryan Jones.[3] After Frazier was advised of and waived his rights, he agreed to speak to the police. Frazier stated that the reason he was selling cocaine was to "make some money for his kids." Frazier had "paid $150 for an eight ball (eighth of an ounce of cocaine) and cut it up at a friend's house." During the interview, Frazier told Dombronsky he knew Dombronsky was a police officer but that he "needs the money."

Frazier also stated to Dombronsky that he began the evening with 27 pills, or bags of crack cocaine, and that he only had two left in his possession when Dombronsky approached him moments before the arrest. Frazier informed police that he swallowed those pills when he was about to be arrested. Dombronsky testified at trial that, considering that the drugs were $10 a piece, Frazier's statement "makes sense because of the approximate amount of money that we recovered from the minivan."

Lieutenant Dombronsky testified that he received "[t]hree small ziploc bags containing what I believed to be crack cocaine," from Frazier in exchange for thirty dollars. Dom-

---

3. Detectives Globther and Jones testified at trial and merely corroborated that they were present during Frazier's interview with Lieutenant Dombronsky.

bronsky gave the drugs to Detective Jacqueline Hubbard in order to have them submitted to Evidence Control. Detective Hubbard testified that she did submit the drugs seized in this case, and that "they tested positive for cocaine base schedule two."

Frazier testified on his own behalf at trial. He denied that he was on Presbury Street on December 18, 2008, and testified that, while he was standing in front of a friend's house on Thomas Avenue, Lieutenant Dombronsky approached him and ordered him to place his hands up. Frazier was placed in handcuffs, had his keys removed from his pocket, and was ordered to sit down. Frazier testified that he was not informed why he was being detained. Other officers arrived and Frazier was transported to the Western District.

While at the police station, Frazier testified that he was questioned about drugs in the neighborhood, and he told police that he knew some people who sold drugs in the area. Frazier further testified that he signed the *Miranda* waiver of rights after Lieutenant Dombronsky told him to do so. Frazier denied that he wrote a statement but did admit that he signed some statements because the officers told him "[s]ign them or you're going to jail." Frazier maintained that he did not sell drugs to Lieutenant Dombronsky. He also did not know about any money in the center console of his vehicle.

We will include additional details in the following discussion.

## DISCUSSION

### I.

■ Frazier first contends that the trial court's *voir dire* procedure violated the Court of Appeals's decision in *Wright v. State*, 411 Md. 503, 983 A.2d 519 (2009). Further, acknowledging that defense counsel did not object to the *voir dire*, Frazier asks this Court to recognize plain error. The State responds by asking us to apply *James v. State*, 191 Md.App. 233, 991 A.2d 122, *cert. denied*, 415 Md. 338, 1 A.3d 468 (2010), where we declined to exercise plain error review for an

276

unpreserved claim that was similar to the one raised in *Wright.* We conclude that, as was the case in *James,* plain error review is not warranted under the circumstances of this case.

■■■ The right to an impartial jury is guaranteed by the Sixth Amendment of the United States Constitution, as made applicable to the states through the Fourteenth Amendment, and Article 21 of the Maryland Declaration of Rights. *See Wright,* 411 Md. at 507, 983 A.2d 519. And, "the 'overarching purpose of *voir dire* in a criminal case is to ensure a fair and impartial jury.' " *Id.* at 508, 983 A.2d 519 (quoting *Dingle v. State,* 361 Md. 1, 9, 759 A.2d 819 (2000)); *see also Drake and Charles v. State,* 414 Md. 726, 733, 997 A.2d 154 (2010) ("The primary purpose of *voir dire* is to ensure a fair and impartial jury"). In fact, "the only purpose of *voir dire* in Maryland is to illuminate to the trial court any cause for juror disqualification." *Wright,* 411 Md. at 508, 983 A.2d 519 (citation omitted). "Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." *Stewart v. State,* 399 Md. 146, 158, 923 A.2d 44 (2007) (citation omitted).

■■■ The trial court has " 'broad discretion in the conduct of *voir dire....* ' " *Wright,* 411 Md. at 508, 983 A.2d 519 (quoting *Dingle,* 361 Md. at 13, 759 A.2d 819); *see also Moore v. State,* 412 Md. 635, 644, 989 A.2d 1150 (2010) ("In the absence of a statute or rule prescribing the questions to be asked of the venirepersons during the examination, the subject is left largely to the sound discretion of the court in each particular case") (citations omitted). "That discretion extends to both the form and the substance of questions posed to the venire." *Wright,* 411 Md. at 508, 983 A.2d 519 (citations omitted); *see also* Md. Rule 4–312 (prescribing the manner of conducting *voir dire* ).

In *Wright,* the Court of Appeals "granted certiorari to consider whether the trial court properly exercised its discretion," *Wright,* 411 Md. at 507, 983 A.2d 519, by asking the venirepersons, "as a group, a roster of seventeen questions."

*Id.* at 506, 983 A.2d 519. After the collective questioning, each venireperson was called to the bench and asked "if he or she had any information in response to the *voir dire* questions" and "if he or she could be fair and impartial." *Id.* Defense counsel objected, arguing that lumping all seventeen *voir dire* questions together frustrated the ability of the jurors to remember all of the questions. *Id.* at 507, 983 A.2d 519.

The Court of Appeals agreed, explaining: "The presentation of a lengthy roster of questions to the venire, without providing the opportunity to answer each question as it was posed, required each venireperson to comprehend and retain far too much information to guarantee that the questions were answered properly." *Id.* at 509, 983 A.2d 519. The Court noted that *voir dire* was "five and a half minutes of continuous questioning, without pause," which "resulted in substantial delay between presentation of the questions and the answers." *Id.* at 511–12, 983 A.2d 519. Accordingly, the Court held that "the selected *voir dire* method may have obscured relevant information from the trial court's view by failing to ensure that the jurors on the venire made reasonably full disclosures. The trial court was therefore working with an incomplete understanding of the jury pool." *Id.* at 513, 983 A.2d 519.

The *Wright* Court, however, qualified its holding by stating:
We are not suggesting that asking questions to a venire panel en masse is an inherently flawed procedure. In this case, it is the multiplicity of the questions that is problematic, not the means by which the questions are broadcast. The key to an effective *voir dire* is allowing venirepersons the meaningful opportunity to digest the individual questions posed to them and to respond fully to each one while the question is at the forefront of their minds.

*Id.* at 514, 983 A.2d 519.[4]

In *Wright*, the issue was preserved by defense counsel's objection at the conclusion of the *voir dire*. *Wright*, 411

---

4. The Court suggested two methods of conducting *voir dire* that would be acceptable. In one method, the Court suggested asking a question to

Md. at 507, 983 A.2d 519. Recognizing that a similar objection was not lodged in this case, Frazier asks this Court to consider the issue as plain error. In *James, supra,* this Court addressed such an issue. As is well established, our discretion to recognize plain error is plenary. *See McMillan v. State,* 181 Md.App. 298, 359, 956 A.2d 716 (2008) ("[W]hen a defendant fails to object, an appellate court possesses plenary discretion to notice plain error material to the rights of a defendant, even if the matter was not raised in the trial court") (citation omitted), *cert. granted,* 406 Md. 744, 962 A.2d 370 (2008). Further, an appellate court "will review the unpreserved claim only where the unobjected to error can be characterized as compelling, extraordinary, exceptional, or fundamental to assure the defendant a fair trial by applying the plain error standard." *Abeokuto v. State,* 391 Md. 289, 327, 893 A.2d 1018 (2006) (citations omitted); *accord James,* 191 Md.App. at 246–47, 991 A.2d 122.

In *James,* we declined to apply plain error to a *voir dire* procedure that was error under *Wright,* stating:

We decline to exercise our discretion in this case to notice plain error in the trial court's *voir dire.* Although an appellate court may address an unpreserved issue to "communicate a desired message to the bench and bar that might otherwise go unsent," *McMillan,* 181 Md.App. at 360 [956 A.2d 716], the Court of Appeals has already spoken clearly in *Wright,* obviating the need for further appellate exploration of this issue. Furthermore, the "error" of which appellant complains was not "plain" at the time of trial in this case. *Cf.* [*Height v. State,* 185 Md.App. 317, 332–33, 970 A.2d 921 ("it has been held consistently that there is nothing

---

the entire venire and then allowing the prospective jurors "to respond to that individual question through a show of hands before moving on to the next one." *Wright,* 411 Md. at 514, 983 A.2d 519. After all questions were completed, the judge would then "call those jurors who made an affirmative response to the bench for further inquiry." *Id.* Another method of conducting *voir dire* would have a trial court "distribute a written list of questions to the venire prior to *voir dire,* and allow jurors the opportunity to note their answers as each question is asked." *Id.*

improper about a trial judge's questioning prospective jurors as a group."), *rev'd,* 411 Md. 662, 984 A.2d 871 (2009) ]. An error would not be "plain" unless it is wrong under current law. *See United States v. Olano,* 507 U.S. 725, 734 [113 S.Ct. 1770, 123 L.Ed.2d 508] (1993). At the time of the trial in the case before us, Maryland's appellate courts had yet to address whether the manner in which the *voir dire* was conducted was error. No extraordinary circumstances are present in the case before us to invoke our discretion to address an unpreserved claim of error that has since been addressed by the Court of Appeals.

*James,* 191 Md.App. at 247, 991 A.2d 122.

Frazier contends that *James* is distinguishable because, in that case, the court used the "very same method used in *Wright,*" and therefore "this Court's refusal to consider the issue made sense." Frazier then states: "In the instant case, however, the trial court employed a different technique. It employed a technique, moreover, that is likely to become more popular in the wake of *Wright.*"

Here, Frazier's trial began on June 5, 2009, with jury selection. *Wright* subsequently was decided on November 16, 2009. Similar to our observations in *James,* any error in the *voir dire* procedure was not plain under then current law. *James,* 191 Md.App. at 247, 991 A.2d 122. As we concluded in *James,* "[n]o extraordinary circumstances are present in the case before us to invoke our discretion to address an unpreserved claim of error that has since been addressed by the Court of Appeals." *James,* 191 Md.App. at 247, 991 A.2d 122. Thus, we decline to find plain error in the *voir dire* procedure used in this case.

## II.

Frazier next asserts that the court erred in not declaring a mistrial when Frazier and one of the courtroom sheriffs "exchanged words in front of the jury." The State responds that a mistrial was not warranted and disputes Frazier's contention that he was prejudiced by the exchange.

We conclude that the court did not abuse its discretion in denying the motion for mistrial.[5]

During the course of Lieutenant Dombronsky's testimony explaining the area of the transaction, and after the jury was excused for a short recess, defense counsel moved for a mistrial. Defense counsel provided the following basis for the motion:

> Because the second time that we went up to the easel, Mr. Frazier didn't come up right away, but—he did come up, but he went back. Then he came up and the Sheriff was directing him where to go and, at the end here, she was right behind him and he was asked a question what she was doing. And she was talking to him and I think in a manner that shows that he's locked up.
>
> So the impression from the interaction—I'm afraid the impression that the jury has is that he's locked up and, if he's locked up, he must be guilty of something. It hurts his presumption of innocence, Your Honor, and prejudices him.

The trial court denied the motion for mistrial and ordered the Sheriff to "stay away from him. Don't go anywhere near him." The trial court then provided a detailed explanation for the ruling on the record. After considering pertinent law, the court stated:

> So as I understand it here, the State put up an easel near the jury box. The Defense counsel stood near the easel. The Defendant went over and stood near the easel, and then there was interaction between the Sheriff and the Defendant, at which point the Defendant became agitated.
>
> That's not the same thing as shackling or putting on prison clothing or anything else of that nature. The Sheriff

---

5. We note that both parties refer to a videotape of the trial proceedings in their briefs. Because this videotape is not included in the record on appeal, we will only consider this issue as it was presented through the trial transcripts. *See* Md. Rule 8–501(c) (the contents of record "shall contain all parts of the record that are reasonably necessary for the determination of the questions presented by the appeal and any cross-appeal"); *see also Mora v. State,* 355 Md. 639, 650, 735 A.2d 1122 (1999).

can maintain a certain amount of security and I don't believe that any interaction between the Defendant and the Sheriff is going to in any way interfere with the presumption of innocence, which will be thoroughly covered in the instructions.

In order not to exacerbate the situation, the Defendant will not get up again, unless he walks to the witness stand when testifying as a defense witness and the Sheriff will not speak to the Defendant any further during the trial.[6]

 Granting a mistrial is "an extraordinary act which should only be granted if necessary to serve the ends of justice." *Cooley v. State*, 385 Md. 165, 173, 867 A.2d 1065 (2005) (citation omitted). Whether to grant a request for a mistrial is left to the sound discretion of the trial court. *Id.; see also Powell v. State*, 406 Md. 679, 694, 961 A.2d 1131 (2008) ("We note that a mistrial is generally an extraordinary remedy and that, under most circumstances, the trial judge has considerable discretion regarding when to invoke it") (citation omitted). The determining factor is whether "the prejudice to the defendant was so substantial that he was deprived of a fair trial." *Kosh v. State*, 382 Md. 218, 226, 854 A.2d 1259 (2004) (citation omitted).

 Control over courtroom security is within the "broad discretion" of the trial court. *Cooley*, 385 Md. at 182, 867 A.2d 1065 (citation omitted); *see also Miles v. State*, 365 Md. 488, 570, 781 A.2d 787 (2001) ("The decision as to the method and extent of courtroom security is left to the sound discretion of the trial judge"); accord *Whittlesey v. State*, 340 Md. 30, 85, 665 A.2d 223 (1995) ("As a discretionary matter, the district judge's decision with regard to measures for security is sub-

---

6. Defense counsel offered no further objection to the court's resolution of the issue during trial. This includes a subsequent demonstration during the course of Lieutenant Dombronsky's testimony when the court told defense counsel "you may reposition yourself, but you [sic] client has to stay put." The court gave the pattern instruction on the presumption of innocence and reasonable doubt during jury instructions. *See Maryland Criminal Pattern Jury Instructions* 2:02, at 18 (2005) ("MPJI–Cr").

ject to a limited review to determine if it was abused")
(citation omitted). Further, as the Court of Appeals has
stated: "[i]t is obvious that some security is necessary or
desirable in most, if not all, criminal trials. It is equally
obvious that not all security measures will result in prejudice
to the defendant." *Bruce v. State,* 318 Md. 706, 718, 569 A.2d
1254 (1990); *see also State v. Latham,* 182 Md.App. 597, 617,
959 A.2d 90 (2008) ("not all juror sightings of a restrained
defendant are so inherently prejudicial as to require corrective
measures by the trial court"), *cert. denied,* 407 Md. 277, 964
A.2d 676 (2009).

We are not persuaded that the extreme remedy of a mistrial
was warranted in this case. According to the proffer and the
court's comments, the contact between Frazier and the sher-
iff's deputy appears to have been a limited one. As is well
established, the conduct of criminal trials falls within the
sound discretion of the trial judge, which will not be disturbed
absent a clear showing of abuse. The fundamental rationale
for this deference is that "the trial judge is physically on the
scene, able to observe matters not usually reflected in a cold
record.... The judge has his finger on the pulse of the trial."
*State v. Cook,* 338 Md. 598, 615, 659 A.2d 1313 (1995) (citation
omitted). The trial court did not abuse its discretion in
denying the motion for mistrial.

### III.

Finally, Frazier contends that the trial court erred
by overruling defense counsel's objections to the prosecutor's
rebuttal closing argument. The State disagrees and responds
that Frazier was not prejudiced by the remarks as any error
was harmless beyond a reasonable doubt. While the prosecu-
tor's remarks were improper, we agree they were not so
prejudicial as to warrant reversal and a remand for a new trial
under the circumstances.

Frazier takes issue with the following remarks the prosecu-
tor made during rebuttal closing argument:

[PROSECUTOR]: Now I don't want you to think well this is such a (unintelligible) case there must be something going on, be suspicious that there must be something. Well why would the Defendant want a trial if he's already—

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Overruled.

[PROSECUTOR]:—signed a confession that the money is found on him. There must be something weird. No, the fact is everybody has a right to a trial, not just innocent people, not just guilty people. Everybody has a right to a trial. Guilty people have a right to a trial. That's what we had today.

[DEFENSE COUNSEL]: Objection, Your Honor.

THE COURT: Overruled.

[PROSECUTOR]: So again, don't think well there must be something up. . . .

■■■■■ The Court of Appeals has consistently stated that counsel is afforded considerable leeway in closing argument, and that regulation of closing arguments falls within the sound discretion of the trial court. *See Mitchell v. State*, 408 Md. 368, 380, 969 A.2d 989 (2009) ("Generally, counsel has the right to make any comment or argument that is warranted by the evidence proved or inferences therefrom") (quoting *Wilhelm v. State*, 272 Md. 404, 412, 326 A.2d 707 (1974)). Although arguments must be limited to the issues in the case on trial, the evidence, and any reasonable inferences, counsel is allowed "liberal freedom of speech." *Wilhelm*, 272 Md. at 413, 326 A.2d 707. Improper closing argument remarks will only warrant reversal if they "actually misled the jury or were likely to have misled or influenced the jury to the prejudice of the accused." *Spain v. State*, 386 Md. 145, 158, 872 A.2d 25 (2005) (quoting *Degren v. State*, 352 Md. 400, 431, 722 A.2d 887 (1999)).

■■■■■ In addition, as this Court has recently stated:

The determination whether counsel's "remarks in closing were improper and prejudicial, or simply a permissible

rhetorical flourish, is within the sound discretion of the trial court to decide." *Jones–Harris v. State,* 179 Md.App. 72, 105, 943 A.2d 1272, *cert. denied,* 405 Md. 64, 949 A.2d 652 (2008). An appellate court generally will not reverse the trial court "unless that court clearly abused the exercise of its discretion and prejudiced the accused." [*Degren v. State,* 352 Md. 400, 431, 722 A.2d 887 (1999) ].

*Sivells v. State,* 196 Md.App. 254, 271, 9 A.3d 123 (2010).

Frazier's contention is that the aforementioned remarks by the prosecutor prejudiced him in the eyes of the jury because, "[w]ith that argument, the prosecutor suggested to the jury that Mr. Frazier was wasting the jury's time. The implication was that with such overwhelming evidence Mr. Frazier should have chosen a different course of action." We agree that it is problematic when the prosecutor asks the jury to consider Frazier's motives in requesting a trial by jury. Unfortunately, neither party has directed us to a case on point.

In considering this issue, we begin with the constitutional right at issue. The Court of Appeals recently stated:

The right to a jury trial in Maryland in qualifying criminal cases is guaranteed by the Sixth Amendment to the United States Constitution and by Articles 5 ("[T]he inhabitants of Maryland are entitled to ... trial by jury...."), 21 ("[I]n all criminal prosecutions, every man hath a right to ... a speedy trial by an impartial jury, without whose unanimous consent he ought not to be found guilty."), and 24 (due process) of the Maryland Declaration of Rights.... A defendant may elect to waive this right and instead be tried by the court.

*Boulden v. State,* 414 Md. 284, 293–94, 995 A.2d 268 (2010) (footnote and citations omitted).

While we have not found a case in Maryland on the precise point before us, the Court of Appeals has recognized that the prosecutor may not comment on the defendant's decision not to testify during trial. *See Marshall v. State,* 415 Md. 248, 261, 999 A.2d 1029 (2010) ("the federal constitutional right against compelled self-incrimination prohibits prosecutorial

comment on the accused's silence or failure to testify") (quoting *Smith v. State*, 367 Md. 348, 353, 787 A.2d 152 (2001), in turn, citing *Griffin v. California*, 380 U.S. 609, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965)).[7] There seems little reason to apply a different standard to Frazier's decision whether or not to exercise the constitutional right to trial by jury. *Cf. Johnson v. State*, 274 Md. 536, 542–43, 336 A.2d 113 (1975) ("[I]t is improper to conclude that a decision, constitutionally protected, not to plead guilty and in doing so to require the State to prove the defendant's guilt beyond a reasonable doubt, is a factor which ought to, in any way, influence the sentencing judge to the detriment of the accused") (footnote omitted).

Our decision concluding that the remark in this case was improper is supported by a number of out-of-state authorities. *See United States v. Ochoa–Zarate*, 540 F.3d 613, 618–19 (7th Cir.2008) (concluding that new trial was not required where prosecutor commented on defendant's exercise of his right to jury trial because any error was harmless beyond a reasonable doubt); *Burns v. Gammon*, 260 F.3d 892, 896 (8th Cir.Mo. 2001) (holding trial counsel was ineffective for failing to object to improper argument about defendant's exercise of his right to a jury trial, and stating that "[t]he prosecution cannot use the defendant's exercise of specific fundamental constitutional guarantees against him at trial") (citations omitted); *People v. Rodgers*, 756 P.2d 980, 985 (Colo.1988) (holding that the prosecutor's improper remarks referring to the defendant's exercise of his constitutional right to a trial by jury was not plain error requiring reversal); *Bell v. State*, 723 So.2d 896, 897 (Fla.Dist.Ct.App.1998) (while prosecutor's argument that the "only one reason we're here" was because defendant had a right to a jury trial was improper, the remark was harmless beyond a reasonable doubt); *People v. Barge*, 7 Ill.App.3d 721, 288 N.E.2d 492, 495 (1972) (concluding prosecutor's comments about defendant's choice of a jury trial were improper, but were not so prejudicial as to require reversal); *Perdue v.*

---

7. We note that this maxim is not implicated in this case because Frazier did, in fact, testify.

*Commonwealth,* 916 S.W.2d 148, 163–64 (Ky.1995) (remanding for a new sentencing because it was improper during that phase of the proceedings to "refer to the 'time and trouble' occasioned by a plea of not guilty and the resulting trial") (citation omitted); *People v. Crouch,* 64 Mich.App. 98, 235 N.W.2d 74, 75 (1975) (reversing where prosecutor commented on defendant's election of a trial by jury, because "[t]o argue to a jury that a defendant should, in effect, be penalized because he chose to exercise those rights guaranteed to him by the constitutions, Federal and state, is gross incurable error") (citations omitted); *Brooks v. State,* 763 So.2d 859, 864 (Miss.2000) (reversing based on the prosecutor's remarks regarding defendant's failure to plead guilty and exercise of his right to a jury and analogizing to cases where reversal was based on improper argument concerning a defendant's decision not to testify); *State v. Thompson,* 118 N.C.App. 33, 454 S.E.2d 271, 276–77 (1995) (holding that prosecutor's comments asserting defendant was "hiding behind the law" and "sticking the law in somebody's eye," was improper comment on the right to a jury trial, but was harmless beyond a reasonable doubt); *State v. Tumbleson,* 105 Ohio App.3d 693, 664 N.E.2d 1318, 1322–23 (1995) (while the prosecutor's remarks asked the jury to draw an adverse inference based on Frazier's exercise of his right to a jury trial, the remarks did not amount to reversible error); *Wages v. State,* 703 S.W.2d 736, 740–41 (Tex.App.1985) (concluding that, while prosecutor's argument that the only reason the jury had to come to court for four days was because Frazier insisted on a trial were improper, reversal was not required).

▮▮▮▮ Our conclusion that the remarks were improper is not the end of our inquiry, however. As the Court of Appeals has recently stated:

A reviewing court will not reverse a conviction due to a prosecutor's improper comment or comments unless there has been an abuse of discretion by the trial judge of a character likely to have injured the complaining party. We must determine, upon our own independent review of the record, whether we are able to declare a belief, beyond a

reasonable doubt, that the error in no way influenced the verdict. A prosecutor's improper comments influenced the verdict, and therefore require reversal, if it appears that the ... remarks actually misled the jury or were likely to have misled or influenced the jury to the defendant's prejudice....

To determine whether improper comments influenced the verdict, we look to the facts of the case at hand. In particular, we consider the severity of the remarks, the measures taken to cure any potential prejudice, and the weight of the evidence against the accused. Instead of considering each improper statement independently, ... we look at the cumulative effect of all errors on the ability of a jury to render a fair and impartial verdict in the context of the case.

*Donaldson v. State,* 416 Md. 467, 496–97, 7 A.3d 84 (2010) (citations and emphasis omitted); *see United States v. Young,* 470 U.S. 1, 11–12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) ("Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding"); *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (although there are some rights so basic to a fair trial that their infraction can never be harmless, all trial errors implicating the Constitution do not automatically call for reversal); *see also Sivells,* 196 Md.App. at 288–92, 9 A.3d 123 (holding that reversal was required where prosecutor's improper remarks were an attempt to bolster its witnesses in a close case that primarily depended on credibility of those witnesses, and where curative instructions were not sufficient to cure the potential prejudice from those remarks).

Beginning with the severity of the remarks, it is clear that the remarks were an isolated instance during rebuttal closing argument. Under certain circumstances, a prosecutor's rebuttal argument must be placed in context and may be an entirely appropriate argument in response. *See Degren,* 352 Md. at 431–32, 722 A.2d 887 (finding comments by the prosecution during closing argument, though "unprofessional and injudi-

cious," to be nonetheless acceptable when "made in response to the defense counsel's comments during closing argument that the jury should not believe the State's witnesses because they had various motives to lie"); *see also Brown v. State,* 339 Md. 385, 394, 663 A.2d 583 (1995) (stating that a State's rebuttal closing argument is proper if it is "nothing more than a reasonable reply to the arguments made by defense counsel").

The State suggests that the rebuttal argument was in response to defense counsel's "theory that the State's case was riddled with strange behavior by the police." Defense counsel had argued that it was "odd" that a police lieutenant would make a drug arrest on the streets of Baltimore. Defense counsel also suggested that this arrest was somehow related to arrest statistics and the lieutenant's need to "make himself available, to make himself a hero, to make himself . . . valuable as a lieutenant, this is what I need to do."

In response to this suggestion that something "weird" was going on in this case, the prosecutor surmised that the jury might be wondering "why would the Defendant want a trial if he's already . . . signed a confession that the money is found on him." The prosecutor then answered his own question by stating that "everybody has a right to a trial, not just innocent people, not just guilty people. Everybody has a right to a trial. Guilty people have a right to a trial. That's what we had today."

The State contends that this argument was responsive to the defense's suggestion that this was an unusual case because, "[i]n context, [the prosecutor] did not say Frazier should not have requested a trial, but rather that his request for a trial, after confessing, does not implicate the police with wrongdoing." Given the limited nature of the remarks, and its context, we are not persuaded that the comment was of a nature to injure Frazier. *Cf. Lee v. State,* 405 Md. 148, 178–79, 950 A.2d 125 (2008) (concluding that the cumulative effect of the prosecutor's comments was sufficiently prejudicial to deny the defendant a fair trial, and that the judge's curative

instruction was not contemporaneous and specific enough to cure any resulting prejudice).

In addition, although the trial court did not issue a curative instruction, we note that the court informed the jury that "[o]pening statements and closing arguments of lawyers are not evidence in this case. They're intended only to help you understand the evidence and to apply the law. Therefore, if your memory of the evidence differs from anything the lawyers say or I may say you must rely on your own memory of the evidence." As the Court of Appeals has acknowledged, "such general jury instructions have a curative effect, as Maryland courts long have subscribed to the presumption that juries are able to follow the instructions given to them by the trial judge, particularly where the record reveals no overt act on the jury's part to the contrary." *Donaldson,* 416 Md. at 499, 7 A.3d 84 (citation omitted).

Finally, concerning the weight of the evidence, although there were two primary witnesses in this case, *i.e.,* Lieutenant Dombronsky and Frazier, accompanied by two versions of events, this was not a close case. There was direct evidence before the jury that Frazier sold crack cocaine to the lieutenant. Further, the money Dombronsky used in the transaction was recovered from the center console of Frazier's minivan. And, in his statement to police, Frazier admitted he was selling drugs, stating that he did so in order to "make some money for his kids." While, at trial, Frazier denied that he sold drugs to the police officer, the jury was not required to believe his version of events. *See Sifrit v. State,* 383 Md. 116, 135, 857 A.2d 88 (2004) (the jury is "free to believe some, all, or none of the evidence presented"); *see also Kamara v. State,* 184 Md.App. 59, 79, 964 A.2d 244 ("The credibility of the witnesses at trial is of course for the trier of fact[, and] the trier of fact is under no obligation to believe even uncontradicted explanations or denials of an accused") (citation omitted), *cert. denied,* 409 Md. 45, 972 A.2d 860 (2009).

Considering these factors, we hold that any error in overruling the objection to the prosecutor's rebuttal closing argument was harmless beyond a reasonable doubt.

JUDGMENTS OF THE CIRCUIT COURT FOR BALTI-MORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANT.

